**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**William KORENKIEWICZ, Appellant.**

Superior Court of Pennsylvania.

Submitted June 14, 1999.
Filed Dec. 22, 1999.

W. Russell Carmichael, Media, for appellant.

Nicholas J. Casenta, Jr., Asst. Dist. Atty., West Chester, for Com., appellee.

Before McEWEN, President Judge, and CAVANAUGH, KELLY, POPOVICH, JOHNSON, FORD ELLIOTT, STEVENS, SCHILLER and LALLY–GREEN, JJ.

KELLY, J.:

¶1 Appellant asks us to determine whether the trial court erred when it denied his motion to suppress evidence. Appellant challenges the legal basis for the investigative stop of his vehicle and the propriety of the evidence obtained from the stop. We hold that the information provided by the identified informant was sufficient to support the stop. Accordingly, we affirm Appellant's judgment of sentence.

¶2 The trial court aptly relayed the relevant facts underlying this appeal as follows:

On the evening of August 4, 1997, one Kenneth Pingerton ("Pingerton"), the night manager of an Amoco service station located on 1301 Paoli Pike, West Goshen Township, Chester County, Pennsylvania, first observed [Appellant]'s vehicle (N.T. 4–7). Pingerton described [Appellant]'s vehicle as a "dark colored convertible" which entered the service station and parked (N.T. 7). Pingerton kept his eye on the parked car and eventually, Pingerton went outside and asked [Appellant] if he was "okay" (N.T. 8–9). [Appellant] did not respond to Pingerton's inquiry and at that time, Pingerton noticed that [Appellant]'s head was wobbling and that [Appellant]'s eyes were very wide open (N.T. 9–10). Pingerton suspected that [Appellant] was intoxicated and called 911 relaying to the dispatcher that he "... had a person in the parking lot that was either ill or intoxicated..." (N.T. 10). Pingerton testified that after he called 911 [Appellant] backed his vehicle up and looked at Pingerton through the window and then pulled the vehicle forward. [Appellant] repeated this move-

ment and Pingerton again called 911 because he felt threatened (N.T. 11). While Pingerton was on the phone [Appellant] moved his car to exit the service station on Airport Road.

Police Officer Steven Wassell ("Wassell") was on patrol that evening and testified that he was dispatched to the Amoco station for a suspicious vehicle and person complaint. While en route, Wassell received additional information that the operator may be intoxicated and was preparing to leave (N.T. 14). Wassell testified that when he arrived at the Amoco he observed "a vehicle matching the description given to the Chester County Police Radio as a dark colored convertible." Wassell testified that the vehicle had its [headlights] on and was preparing to pull out of the service station onto Airport Road (N.T. 14). Wassell pulled up behind [Appellant] and activated his overhead lights (N.T. 15). At that time, [Appellant]'s vehicle was running, its headlights were on and it was facing Airport Road (N.T. 15). Wassell approached the driver who[m] he described as "very confused." Wassell testified that [Appellant]'s eyes were bloodshot and glassy and that he detected a strong odor of alcohol on [Appellant] (N.T. 16). Wassell attempted to obtain [Appellant]'s name, but [Appellant]'s speech was slurred and he could not understand him (N.T. 16–17). Wassell also attempted to obtain [Appellant]'s license and registration, but [Appellant] was unable to produce these documents (N.T. 16–17). Wassell asked [Appellant] to get out of his car and described how [Appellant] could barely stand up without leaning on the car (N.T. 17). Based on his experience in previous DUI arrests, as well as his observations of [Appellant], Wassell testified that in his opinion [Appellant] was intoxicated that evening and incapable of operating a motor vehicle (N.T. 18–19). Wassell arrested [Appellant] and had

him transported to Chester County Hospital (N.T. 19).

(Trial Court Opinion, dated June 16, 1998, at 1–3).

¶ 3 Appellant filed a motion to suppress Officer Wassell's observations of Appellant's intoxication. Appellant claimed that the stop was illegal, as it was unsupported by reasonable suspicion of criminal activity. On June 16, 1998, the suppression court denied Appellant's motion, finding that the officer had the requisite reasonable suspicion to support the investigative stop of Appellant's vehicle.

¶ 4 Following a bench trial on February 11, 1998, Appellant was convicted of driving under the influence of alcohol [1] and driving under suspension (DUI related).[2] For the first offense, the court sentenced Appellant to one to two years' incarceration. For driving under suspension, Appellant received ninety days' incarceration, to be served consecutively to the DUI sentence. Appellant appealed his judgment of sentence. A divided panel of this Court filed a memorandum opinion on October 30, 1998, reversing and remanding for a new trial. On November 12, 1998, the Commonwealth filed an application for reargument *en banc.* This Court granted the Commonwealth's motion for reargument *en banc* on January 7, 1999, and withdrew the panel memorandum opinion.

¶ 5 Appellant raises this issue for our review:

DID THE TRIAL COURT ERR IN DENYING APPELLANT'S MOTION TO SUPPRESS, WHERE A POLICE OFFICER STOPPED A VEHICLE UPON UNSUBSTANTIATED RE-PORTS THAT THE VEHICLE WAS BEING OPERATED BY A DRIVER THAT **COULD/MAY** BE INTOXICAT-ED?

Appellant's Brief at 3 (emphasis in original).

---

**1.** 75 Pa.C.S.A. § 3731(a)(1).

**2.** 75 Pa.C.S.A. § 1543(b).

¶ 6 The Pennsylvania Supreme Court set forth the standard and scope of review for a challenge to the denial of a suppression motion as follows:

> Our standard [of] review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Hawkins*, 549 Pa. 352, 377, 701 A.2d 492, 504–05 (1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1535, 140 L.Ed.2d 685, (1998) (citation omitted). If there is sufficient evidence of record to support the suppression court's ruling and that court has not misapplied the law, then we will not disturb the court's decision, particularly with respect to credibility determinations. *Commonwealth v. Queen*, 536 Pa. 315, 639 A.2d 443 (1994).

¶ 7 The parties do not dispute that Appellant was "seized" by Officer Wassell when he activated his signal lights and delayed Appellant's departure from the gas station parking lot onto Airport Road. Appellant's sole issue on appeal is whether Officer Wassell had a legal basis to stop Appellant's vehicle and investigate his condition. Appellant contends that an uncon-firmed report of a driver that "could" or "may" be operating a vehicle while intoxicated is insufficient, without more, to supply a legal basis for stopping his vehicle. In support of his argument, Appellant relies primarily on our Supreme Court's decision in *Commonwealth v. Hamilton*, 543 Pa. 612, 673 A.2d 915 (1996).

¶ 8 In *Hamilton*, an officer observed persons gathered around a vehicle in a parking lot. A woman, who had been outside the car, speaking to the driver, approached the officer and told him that everything was okay and that she had taken the driver's keys. Without making any further observations regarding the driver, Hamilton, the officer drove across the street and parked in another lot. When the police officer noticed that the vehicle was leaving the parking lot, the officer followed. The officer continued to observe the car as it turned into a restaurant parking lot. During his observation, the officer saw no violations of the Motor Vehicle Code on the driver's part nor did he notice anything erratic, improper or unsafe about the driving. After Hamilton car had parked at the restaurant, the officer approached the vehicle and saw that Hamilton had been driving. The police officer promptly arrested Hamilton for DUI.

¶ 9 The *Hamilton* Court reasoned that the basis for the stop was deficient. The woman's statement to the officer that everything was okay and that she had taken the driver's keys was nonspecific and amounted to mere implication that Hamilton was intoxicated.[3] Because the officer

---

**3.** The Dissent's paraphrase or restatement of the holding in *Hamilton* does not accurately reflect the Supreme Court's decision in that case. Specifically, the *Hamilton* case did not involve a statement that the driver **was** intoxicated. To the contrary, the report at issue in *Hamilton* merely **implied** intoxication. Thus, the *Hamilton* Court had to decide "whether the statement, in and of itself, provided the officer with a sufficient basis to justify the stop of [Hamilton]'s vehicle." *Id.* at 618, 673 A.2d at 918. In short, at issue in *Hamilton* was the adequacy of the citizen's report be-cause it **only implied** intoxication. The *Hamilton* Court held that a mere implication of intoxication, albeit an obvious implication was insufficient to support an investigative stop. Therefore, "stating that 'everything is o.k.' and that someone has another's keys does not, under the circumstances of the case, create reasonable and articulable grounds to suspect a Vehicle Code violation." *Id.* at 619, 673 A.2d at 919. Accordingly, the *Hamilton* holding is actually more limited than that expressed by the dissent in the instant case.

did nothing to verify the woman's statement, or observe anything on his own to substantiate her suggestion, the Court concluded that the officer did not possess articulable and reasonable grounds to suspect that the driver was intoxicated. The *Hamilton* Court, therefore, held that the stop was illegal and any evidence gained as a result of the stop should have been suppressed.

¶ 10 Appellant contends that *Hamilton* is dispositive of the instant case. Appellant claims that the informant's report in the present case, as in *Hamilton*, was equivocal at best and mandated independent observation by Officer Wassell. Like the officer in *Hamilton*, Appellant asserts, Officer Wassell had observed nothing on his own to substantiate the Pingerton's report. Appellant asserts that the stop and ensuing investigation were improper, without Officer Wassell's independent knowledge, information or observations that a crime was being committed. Appellant concludes that the impropriety of the stop invalidated all evidence derived from the stop and warranted its suppression. We disagree.

■■■ ¶ 11 Pennsylvania law recognizes two instances where police may "seize" an individual in compliance with the constitutional prohibitions against warrantless searches and seizures. *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996). One constitutionally permissible circumstance occurs when the police have probable cause to believe that a crime is being committed or is about to be committed. *Id.* Custodial detentions and arrests implicate this "probable cause" standard. *Commonwealth v. Ellis*, 379 Pa.Super. 337, 549 A.2d 1323 (1988), *appeal denied*, 522 Pa. 601, 562 A.2d 824 (1989). The other circumstance is a more limited seizure, which is justified by a reasonable suspicion that criminal activity is occurring. *Melendez, supra* (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Commonwealth v. Hicks*, 434 Pa. 153, 253 A.2d 276 (1969)). The more limited sei-

zures, implicating the "reasonable suspicion" standard, can be in the form of *Terry* stops, traffic stops, investigative detentions, and non-custodial detentions. *Ellis, supra.* Thus, the classification of the interaction between police and citizen determines the scope of applicable constitutional protections. *Id.*

■■■ ¶ 12 A police officer may stop a vehicle when he has reasonable, articulable facts to suspect a violation of the Vehicle Code. 75 Pa.S.C.S. § 6308(b); *Commonwealth v. Whitmyer*, 542 Pa. 545, 668 A.2d 1113 (1995) (confirming correct standard for vehicular stops as "articulable and reasonable grounds to suspect" violation of Vehicle Code); *Commonwealth v. McElroy*, 428 Pa.Super. 69, 630 A.2d 35 (1993) (*en banc*), *appeal denied*, 543 Pa. 729, 673 A.2d 335 (1996) (adopting "articulable and reasonable grounds to suspect" as preferred standard for vehicular stops). "The reasonable suspicion necessary to justify a vehicular stop is less stringent than probable cause, but the officer must have more than a hunch as the basis of a stop." *Commonwealth v. Wright*, 448 Pa.Super. 621, 672 A.2d 826, 830 (1996).

■■■ ¶ 13 A police officer, however, need not personally observe the illegal or suspicious conduct, which forms the basis for the reasonable suspicion, but may rely, under certain circumstances, on information provided by third parties. *Id.* This Court recently articulated the current status of Pennsylvania law regarding investigative stops based on citizen "tips" as follows:

> [W]hen the police stop a vehicle in this Commonwealth for investigatory purposes, the vehicle, and its occupants are considered "seized" and this seizure is subject to constitutional restraints. An investigatory stop of an automobile is justified only when it is based upon objective facts creating a reasonable suspicion the vehicle's occupants are presently involved in criminal activity. To meet this standard, the officer must point to

specific articulable facts which, together with the rational inferences therefrom, reasonably warrant the intrusion.

To have reasonable suspicion, police officers need not personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including "tips" from citizens. Naturally, if a tip has a relatively low degree of reliability more information will be required to establish the requisite quantum of suspicion. . . .

However, a tip from a known informer may carry enough indicia of reliability for the police to conduct an investigative stop, even though the same tip from an anonymous informant would likely not have done so. Indeed, a known informant places himself at risk of prosecution for filing a false claim if the tip is untrue, whereas as unknown informant faces no such risk.

*Commonwealth v. Lohr*, 715 A.2d 459, 461–62 (Pa.Super.1998) (internal quotation marks and citations omitted). When an identified third party provides information to the police, we must examine the specificity and reliability of the information provided. *In the Interest of S.D.*, 429 Pa.Super. 576, 633 A.2d 172 (1993). The information supplied by the informant must be specific enough to support reasonable suspicion that criminal activity is occurring. *Commonwealth v. Allen*, 555 Pa. 522, 725 A.2d 737 (1999). To determine whether the information provided is sufficient, we assess the information under the totality of the circumstances. *Id.* The informer's reliability, veracity, and basis of knowledge are all relevant factors in this analysis. *Id.*

¶ 14 Pennsylvania law also permits a vehicle stop based upon a radio bulletin if evidence is offered at the suppression hearing to establish reasonable suspicion. *Queen, supra. See also Commonwealth v. Janiak*, 368 Pa.Super. 626, 534 A.2d 833 (1987) (allowing police to make stop of individual suspected of intoxication based upon radio information, al-

though police had not personally observed unusual or criminal conduct); *Commonwealth v. Prengle*, 293 Pa.Super. 64, 437 A.2d 992 (1981) (permitting investigative stop of vehicle matching description of stolen truck, supplied to police *via* radio bulletin). The mere fact that the police receive their information over the police radio does not, of itself, establish or negate the existence of reasonable suspicion. *Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571 (1997).

¶ 15 Established Pennsylvania law generally accepts that intoxication is a condition within the understanding or powers of observation of ordinary citizens. *Miller v. Borough of Exeter*, 366 Pa. 336, 77 A.2d 395 (1951); *Lohr, supra; Commonwealth v. Bowser*, 425 Pa.Super. 24, 624 A.2d 125 (1993), *appeal denied*, 537 Pa. 638, 644 A.2d 161, *cert. denied*, 513 U.S. 867, 115 S.Ct. 186, 130 L.Ed.2d 120 (1994); *Janiak, supra; Commonwealth v. Neiswonger*, 338 Pa.Super. 625, 488 A.2d 68 (1985); *Commonwealth v. Boerner*, 268 Pa.Super. 168, 407 A.2d 883 (1979); *In Interest of Wright*, 265 Pa.Super. 278, 401 A.2d 1209 (1979). Our case law has consistently allowed statements such as "He looked drunk," to serve as a shorthand or compendious statement of fact based upon personal observation. *Camp Const. Corp. v. Lumber Products Co.*, 311 Pa.Super. 381, 457 A.2d 937 (1983).

¶ 16 In the instant case, the information available to Officer Wassell was provided by an identified source, Kenneth Pingerton. Police received Pingerton's identity and location through his 911 call. In that call, he reported that a suspicious person in a dark colored convertible was parked at his Amoco service station. Concerned for his safety, Pingerton described the vehicle and its exact location. Soon thereafter, Pingerton called 911 again to report that the driver of the vehicle appeared ill or intoxicated and was about to pull out, onto the road. Officer Wassell received all of this information via radio

and arrived at the location within minutes of the report. There, Officer Wassell saw a vehicle matching the description in the report at the exact location provided by Pingerton. The location and description of the vehicle matched the report. Thus, Officer Wassell had sufficient reason to believe that Appellant and his vehicle were the subjects of Pingerton's report. *See Janiak, supra.*

¶ 17 Further, the content of Pingerton's report was not equivocal. Pingerton's use of the description "ill or intoxicated" is just the form of shorthand or compendious statement of fact based upon his personal observation that is acceptable under Pennsylvania law. It was sufficient to arouse public concern that an intoxicated person was about to reenter traffic. Moreover, Pingerton's report that Appellant was "**either** ill **or** intoxicated" does not diminish Officer Wassell's level of reasonable suspicion. *See Commonwealth v. Riley,* 715 A.2d 1131 (Pa.Super.1998), *appeal denied,* 558 Pa. 617, 737 A.2d 741 (1999) (reiterating that merely because suspected criminal behavior may also be consistent with innocent behavior does not alone make detention and limited investigation illegal). Accordingly, we hold that Officer Wassell was constitutionally authorized to execute a brief stop to maintain the status quo while he obtained more information. *See Janiak, supra* (quoting *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).

¶ 18 Moreover, Kenneth Pingerton testified at Appellant's suppression that from the inside of the station, he saw Appellant drive his car into the station parking lot and sit there for close to twenty minutes. Pingerton described Appellant's vehicle as a "dark colored convertible." Pingerton kept his eye on the parked car and eventually went outside and asked Appellant if he was "okay." Appellant did not respond to Pingerton's inquiry and at that time, Pingerton noticed that Appellant's head was wobbling and that his eyes were "very wide open." Pingerton suspected that Appellant was intoxicated and called 911 relaying to the dispatcher that he "... had a person in the parking lot that was either ill or intoxicated...." Pingerton testified that after he called 911, Appellant backed his vehicle up and looked at Pingerton through the window and then pulled the vehicle forward. Appellant repeated this movement, which alarmed Pingerton and he again called 911 because he felt threatened. While Pingerton was on the phone, Appellant moved his car to exit the service station on Airport Road. The record establishes that Pingerton's report was the result of his ongoing personal observation. (N.T., 2/11/98, at 7–11). *See Lohr, supra.* Therefore, Pingerton's report was a reliable, appropriate basis for Officer Wassell's investigative stop.

¶ 19 Officer Wassell testified at the suppression hearing that he had been dispatched to the Amoco station for a suspicious vehicle and person complaint. While en route, Officer Wassell received additional information that the operator may be intoxicated and was preparing to leave the location. When he arrived at the Amoco Officer Wassell observed a vehicle matching the description that Pingerton had given to the Chester County Police. The vehicle's highlights were on and Appellant was preparing to pull out of the service station onto Airport Road. As Officer Wassell pulled up behind Appellant's car, he activated his overhead lights. At that time, Appellant's vehicle was running and the headlights were on; the vehicle was located about five to ten feet from the station's exit. (N.T., 2/11/98, at 12–15).

¶ 20 Based on the information available, Officer Wassell had reasonable suspicion that Appellant was violating the vehicle code by operating his vehicle while under the influence of alcohol. Under the totality of the circumstances, including the reliability, veracity and basis of Pingerton's report, *see Allen, supra,* we hold that Officer Wassell was justified in stopping Appellant's vehicle to investigate his condi-

tion. Accordingly, the trial court properly denied Appellant's suppression motion.

¶ 21 Judgment of sentence affirmed.

¶ 22 JOHNSON, J. files a dissenting opinion in which McEWEN, President Judge, POPOVICH and SCHILLER, JJ. join.

JOHNSON, J., dissenting.

¶ 1 When police stop a vehicle in this Commonwealth for investigative purposes, the vehicle and its occupants are considered "seized" and this seizure is subject to constitutional constraints. *Commonwealth v. Blouse*, 531 Pa. 167, 169, 611 A.2d 1177, 1178 (1992); *Commonwealth v. Knotts*, 444 Pa.Super. 60, 663 A.2d 216, 218 (1995). An officer may make an investigative stop where he observes unusual conduct that leads him reasonably to conclude that criminal activity may be afoot. *Knotts*, 663 A.2d at 219 (quoting *Commonwealth v. Valenzuela*, 408 Pa.Super. 399, 597 A.2d 93, 98 (1991)). Such an investigative stop of an automobile must be based on objective facts creating a reasonable suspicion that the motorist is presently involved in criminal activity. *Id.*

¶ 2 In this case, we must determine whether, at the time he activated the overhead lights on his marked police vehicle, Officer Steven Wassell possessed sufficient information to support a reasonable suspicion that the defendant, William Korenkiewicz, was "presently involved in criminal activity." *Commonwealth v. Whitmyer*, 542 Pa. 545, 550, 668 A.2d 1113, 1116 (1995) (determination of reasonable suspicion may be made only on the basis of information actually possessed by police officer). In my view, Officer Wassell's testimony at the suppression hearing falls far short of supporting any reasonable suspicion of criminal activity. Accordingly, I must respectfully dissent.

¶ 3 In *Commonwealth v. Lohr*, 715 A.2d 459 (Pa.Super.1998), a panel of this court summarized the law of Pennsylvania on the subject of investigative stops of motor vehicles as follows:

It is well established that when the police stop a vehicle in this Commonwealth for [investigative] purposes, the vehicle, and its occupants are considered 'seized' and this seizure is subject to constitutional restraints. An [investigative] stop of an automobile is justified only when it is based upon objective facts creating a reasonable suspicion the vehicle's occupants are presently involved in criminal activity. To meet this standard, the officer must point to specific articulable facts which, together with the rational inferences therefrom, reasonably warrant the intrusion.

To have reasonable suspicion, police officers need not personally observe the suspicious or illegal conduct, but may rely on the information of third parties, including "tips" from citizens. Naturally, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

\* \* \* \*

When the underlying source of the officer's information is an anonymous call, the tip should be treated with particular suspicion. However a tip from a known informer known to the police may carry enough indicia of reliability for the police to conduct an investigative stop, even though the same tip from an anonymous informant would likely not have done so.

*Id.* at 461 (internal quotation marks and citations omitted).

¶ 4 Of course, the investigating officer need not have personal knowledge of the facts that support probable cause for an investigative stop. *Commonwealth v. Cullen*, 340 Pa.Super. 233, 489 A.2d 929, 937 (1985). He may reasonably rely upon radio transmissions so long as the officer issuing the information has received reasonably trustworthy information sufficient

to warrant a man of reasonable caution in believing that the suspect has committed or is committing an offense. *Id.* However, an investigative stop cannot be based upon an unparticularized hunch of an officer or of a private citizen. *Commonwealth v. Jackson*, 548 Pa. 484, 490, 698 A.2d 571, 574 (1997); *Commonwealth v. Collazo*, 692 A.2d 1116, 1118 (Pa.Super.1997).

¶ 5 To determine whether Officer Wassell could reasonably suspect that Korenkiewicz had violated the Vehicle Code when he responded to the call from the convenience store, we may consider only the facts as known to the officer at that time. *Whitmyer*, 542 Pa. at 550, 668 A.2d at 1116. In his Opinion, Judge Gavin set forth those facts as follows:

> Police Officer Steven Wassell ("Wassell") was on patrol that evening and testified that he was dispatched to the Amoco station for a suspicious vehicle and person complaint. While en route, Wassell **received additional information that the operator may be intoxicated and was preparing to leave** (N.T. [2–11–98] 14). Wassell testified that when he arrived at the Amoco he observed "a vehicle matching the description given to the Chester County Police Radio as a dark colored convertible." Wassell testified that the vehicle had its highlights on and was preparing to pull out of the service station onto Airport Road (N.T. 14). Wassell pulled up behind the defendant and activated his overhead lights. (N.T. 15).

Trial Court Opinion, 6/16/98, (filed 6/17/98) at 2–3. Judge Gavin's Opinion includes additional facts drawn from Officer Wassell's testimony, none of which are material to a proper determination of whether Officer Wassell had reasonable grounds for suspicion at the time he activated his overhead lights and seized Korenkiewicz's vehicle. Judge Gavin correctly states that the sole issue which he was called upon to address was whether Wassell had a legal basis to stop Korenkiewicz's vehicle and investigate his condition. *Id.* at 3. The

trial court's analysis then proceeds as follows:

> Here, Wassell testified that he was initially dispatched to the Amoco station to investigate a suspicious vehicle and person. **Wassell then received further information that the suspicious vehicle was preparing to exit the service station and that the vehicle's driver may be intoxicated.** Wassell, thus, stopped defendant because he had articulable and reasonable grounds to suspect, or probable cause to believe, that a provision of the Vehicle Code was being violated, specifically, driving under the influence.

*Id.* at 4. These facts, standing alone, cannot establish articulable and reasonable grounds to suspect a violation of the Vehicle Code. Consequently, they do not justify the trial court's denial of the motion to suppress.

¶ 6 An examination of Officer Wassell's entire testimony fails to provide any additional support for a conclusion that grounds existed for a legal stop. When asked, on direct examination, why he responded to the Amoco station on the evening in question, Officer Wassell testified:

> A. We received a call for a suspicious vehicle and person complaint, and we had received additional information while en route to the station that the operator may be intoxicated and was preparing to leave.
>
> Q. Okay. When you observed this vehicle, what did you do, or where did you go?
>
> A. I pulled in through the front entrance to come around to the side, and pulled up behind the vehicle, and I initiated my overhead lights. And I got out and approached the vehicle to talk with the operator.

N.T., 2/11/98, at 14–15. On cross-examination, Officer Wassell repeated his understanding of the information transmitted to him over the police radio:

Q.   Officer, back to prior to the stop, okay, you are on patrol in a marked vehicle; correct?

A.   Correct.

Q.   And you received a radio call from the police radio room; correct?

A.   Correct.

Q.   And what did the radio call say to you?

A.   Well, I can't quote them verbatim, but it was a call for a suspicious vehicle and person in the parking lot of the Amoco Station.

\* \* \* \*

Q.   Did you receive any additional information from the radio room on your way to the scene?

A.   Yes.

Q.   What was it?

A.   That the operator could be intoxicated and that it appeared he was going to be exiting the parking lot.

*Id.* at 20–21.   Officer Wassell reiterated that he initiated his overhead lights when he pulled up behind Korenkiewicz's vehicle.   *Id.* at 21.   He testified that Korenkiewicz was not free to leave, once he, Officer Wassell, initiated his overhead lights. *Id.*   When asked for the reason he had stopped Korenkiewicz, Officer Wassell testified:

A.   I was investigating a suspicious vehicle complaint, and that vehicle matched the description given by the radio room.

Q.   Did you see any traffic violations?

A.   No, I did not.

Q.   Did you see the defendant behave in any way suspiciously prior to the stop?

A.   No.

Q.   Any evidence whatsoever that the defendant was committing a crime when you pulled up?

A.   Not at that moment.

*Id.* at 21–22.

¶ 7 My distinguished colleagues review the testimony of Kenneth Pingerton, the night manager at the Amoco station where the arrest occurred, along with all of the facts contained in Judge Gavin's Opinion, as part of the totality of the circumstances. However, Pingerton's testimony at the suppression hearing is wholly irrelevant to a determination of what conduct Officer Wassell had personally observed or what information he had received over the police radio prior to actuating the overhead lights on the police vehicle.   Defense counsel properly objected to Pingerton's testimony but the objections were overruled by Judge Gavin.   *Id.* at 5–6, 8–9.   Officer Wassell's personal observations and communications are the only relevant subject of inquiry on this appeal, because a determination of reasonable suspicion or probable cause may be made only on that basis. *Whitmyer*, 542 Pa. at 550, 668 A.2d at 1116.   Pingerton's observations of Korenkiewicz's conduct are irrelevant to this issue, unless those observations were both reported to the police via 911 and subsequently communicated to Officer Wassell via police radio prior to the actuation of the overhead lights.   The record does not support such a conclusion.   Similarly, all of Officer Wassell's testimony concerning his observations of Korenkiewicz's behavior *after* he seized Korenkiewicz's vehicle is inadmissible to determine the legality of the stop.   *Commonwealth v. Murray*, 460 Pa. 53, 58–59, 331 A.2d 414, 416–17 (1975) (holding officer must articulate specific facts possessed by him or her at time of vehicular stop providing probable cause to believe Vehicle Code was being violated).

¶ 8 We can accept Pingerton's testimony for the limited purpose of establishing which facts the dispatcher could have received and then subsequently transmitted to Officer Wassell.   Pingerton testified that he told the dispatcher "I had a person in the parking lot that was either ill or intoxicated, and I was afraid they were

going to pull back out on the road." N.T., 2/11/98, at 10. Pingerton went on to testify that, when he placed a second call to police dispatch, "I told them that the person had looked inside and I felt threatened, I was there by myself, that I wanted somebody there as quick as possible." *Id.* at 11. While Pingerton testified to everything he had observed prior to the arrival of Officer Wassell's police vehicle, our focus must be on the facts known to Officer Wassell when he initiated the investigative stop by actuating his overhead lights. Much of what Pingerton observed, as set forth in the recitation of facts in the Majority Opinion at 1–2, had not been reported at the time Officer Wassell initiated the stop. Instead, the certified record reflects only that Pingerton telephoned 911 and reported first that Korenkiewicz "was either drunk or ill," N.T. 10, and on the second call, that Korenkiewicz had looked inside the store and Pingerton felt threatened. N.T. 11.

¶ 9 My distinguished colleagues find *Commonwealth v. Hamilton*, 543 Pa. 612, 673 A.2d 915 (1996), inapposite to the case now before us. However, I conclude that *Hamilton* is applicable to the facts presented here. In *Hamilton*, a police officer observed the defendant's vehicle in a restaurant parking lot. Two women were standing on the driver's side of the vehicle speaking to someone inside. One of these women, Cressley, who was known to the officer, walked over to the police car and told the officer that "everything is O.K., I have his keys." The officer then drove his vehicle out of the parking lot and parked in another lot across the street. Shortly thereafter, the two women, whom the officer had seen previously, entered the defendant's car and the defendant drove away. The officer followed the defendant and arrested him for driving under the influence.

¶ 10 The Supreme Court held that Cressley's statement did not constitute a sufficient basis for an investigative stop. Although the court's recitation of the facts suggests that the officer may have pro-ceeded directly to an arrest rather than make an investigative stop, the court analyzed the case under the "reasonable suspicion" standard, not that of probable cause for an arrest. *Id.* at 617–18, 673 A.2d at 918–19. Furthermore, throughout the opinion, the court repeatedly characterized the encounter between the defendant and the officer as a "stop." *Id.* The court stated that, while the officer had received information that implied that the defendant was intoxicated, he did nothing to verify that conclusion nor did he observe anything on his own to substantiate the claim. *Id.* at 618–19, 673 A.2d at 919. The court cited with approval, but distinguished, *Commonwealth v. Hamme*, 400 Pa.Super. 537, 583 A.2d 1245 (1990), in which a citizen's report that the defendant had been driving erratically was held to constitute articulable and reasonable suspicion which justified a stop. *Id.*

¶ 11 *Hamilton* holds that (i) a citizen's subjective conclusion and subsequent report that a driver is intoxicated, standing alone, will not support an investigative stop, but (ii) a report that sets forth specific objective observations to draw that conclusion will do so. This interpretation of *Hamilton* is consistent with our Supreme Court's requirement that there must exist specific facts that justify the intrusion before the government may single out one vehicle to stop. *Commonwealth v. Swanger*, 453 Pa. 107, 112, 307 A.2d 875, 878 (1973).

¶ 12 The record indicates that Pingerton's call to the police did not set forth the underlying facts upon which he based his conclusion that appellant was "drunk or ill." Under *Hamilton*, I would be compelled to reverse. Pingerton's second call, in which he stated that Korenkiewicz had looked in the store window and that Pingerton was concerned for his safety, does not affect this result. In *Commonwealth v. Boyer*, 455 Pa. 283, 314 A.2d 317 (1974), the Supreme Court held that an officer's testimony that a defendant gave the police an "unusual look" was inadequate to justify

an investigative stop. Pingerton's second call consisted only of a vague assertion that was the substantial equivalent of an "unusual look."

¶ 13 Pingerton may have made sufficient observations to justify his statement to the police that he believed that appellant may have been drunk or ill. However, he did not inform the police of these reasons. The police officer who took the call did not press Pingerton for more details. Therefore, Officer Wassell was left with nothing more than speculation that the suspect may have been either drunk or ill. When coupled with Officer Wassell's admission that he personally observed no untoward behavior prior to initiating the investigative stop, we are left with a shortage of articulable facts sufficient to give rise to a reasonable suspicion that the Vehicle Code was being violated.

¶ 14 A police officer may stop a motor vehicle if he or she has probable cause or articulable and reasonable grounds to suspect a violation of the Vehicle Code. 75 Pa.C.S.A. § 6308(b); *Whitmyer*, 542 Pa. at 550, 668 A.2d at 1116. However, an investigative stop will be held illegal where the officer relies upon a police report that provides no objective facts creating a reasonable suspicion that the suspect is *"presently* involved in criminal activity at the time of the [investigative] stop." *Commonwealth v. Nagle*, 451 Pa.Super. 16, 678 A.2d 376, 378 (1996).

¶ 15 Here, Officer Wassell testified that he initiated his overhead lights because he was investigating a suspicious vehicle complaint and because Korenkiewicz's vehicle matched the description given by the radio room. Prior to the stop, Officer Wassell observed neither suspicious behavior, nor any traffic violation, nor any criminal activity. I am unable to join my colleagues in asserting that a citizen's complaint of a "suspicious vehicle" where the operator may be "drunk" is sufficient to create either probable cause or a reasonable suspicion that a crime had been, or was being, committed. To lower the threshold of rea-

sonable suspicion to this level would be equal to obviating the requirement that police officers possess knowledge of specific articulable facts before they may make an investigative stop. Where the arresting officer concedes that he observed nothing to corroborate the report of a suspicious vehicle, I can only conclude that the motion for suppression of the evidence arising from the investigative stop should have been granted. I would reverse the judgment of sentence, as well as the order denying the suppression motion, and remand for further proceedings in which all evidence secured after the stop was initiated would be suppressed. Hence, this dissent.